UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

United States of America,

      Plaintiff,                    Case No. 15-20740

v.                               Hon. Mark A. Goldsmith

Ozzie McCollough,

      Defendant.

_____/

### United States' Response Brief Opposing the Defendant's Motion for Home Detention/Early Release Due to COVID-19 (Compassionate Release)

In 2015, Ozzie McCollough accepted delivery of a USPS parcel containing about 350 grams of heroin addressed to his home. Minutes later law enforcement executed a search warrant at the home and found McCollough, the parcel of heroin, two guns, a box of assorted ammunition, a digital scale and drug packaging material, $1,190 in cash, and paperwork in McCollough's name.

McCollough pleaded guilty to a drug charge with an enhancement for possessing the guns. The Court sentenced him to 70 months in prison.

McCollough began serving his current sentence on March 2, 2017. He now moves for compassionate release under 18 U.S.C. § 3582(c)(1)(A) and requests that the Court order that his sentence be reduced to home confinement. His motion should be denied.

*First*, since January 2020, the Bureau of Prisons has been preparing for Covid-19, implementing strict precautions to minimize the virus's spread in its facilities. Following two recent directives from the Attorney General, the Bureau of Prisons is also assessing its entire prison population to determine which inmates face the most risk from Covid-19, pose the least danger to public safety, and can safely be granted home confinement. This process necessarily requires the Bureau of Prisons to identify the best candidates for release, ensure that their homes are suitable for home confinement, and arrange a way to quarantine each of them for 14 days. As of May 26, 2020, these directives have already resulted in at least 3,183 inmates being placed on home confinement. *See* BOP Covid-19 Website.

*Second*, McCollough does not qualify for compassionate release. The Court does not have jurisdiction to address his Covid-19-based argument until he fully exhausts his administrative remedies with the Bureau of Prisons based on Covid-19, as required under 18 U.S.C. § 3582(c)(1)(A). Nor, in any event, does McCollough satisfy the statutorily mandated criteria for compassionate release. "[T]he mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). Because § 3582(c)(1)(A) requires that release be "consistent with" the Sentencing Commission's policy statements, McCollough's failure to meet the criteria in USSG § 1B1.13 forecloses relief. Even

2

assuming a defendant facing a heightened risk from Covid-19 might satisfy the criteria in § 1B1.13(1)(A) & cmt. n.1, McCollough does not have a condition that places him at higher risk from Covid-19. McCollough's offense and criminal history make him a danger to the community, which precludes release under USSG § 1B1.13(2). McCollough was an armed drug trafficker: he was caught with 350 grams of heroin (3 times the amount necessary to trigger a 5 year mandatory sentence), two guns, additional ammunition, a large amount of cash, and drug packaging material, and he has a long history of gun and drug offenses. And the § 3553(a) factors—which the Court must also consider under § 3582(c)(1)(A)— likewise do not support release for the same reasons, particularly where he has not even served the mandatory minimum sentence for his offense.

## Background

Undercover law enforcement delivered a USPS parcel that they discovered contained 350 grams of heroin and that had been shipped from California. McCollough accepted the parcel. Minutes later law enforcement executed a search warrant and found McCollough alone. During a search law enforcement found the parcel containing heroin, a loaded .40 caliber pistol under the couch in the living room, an unloaded .22 caliber pistol in the front closet of the house, a box of assorted ammunition, a digital scale and drug packaging material, $1,190 in cash, and paperwork in McCollough's name.

3

McCollough had a lengthy criminal history that included convictions for carrying a concealed weapon (twice), cocaine possession (three times), disorderly conduct (twice), and home invasion, among other offenses. (PSR ¶¶ 31-41). During one of his arrests of cocaine possession he was found with a loaded assault rifle and loaded revolver. While incarcerated for home invasion he received four misconduct citations. (PSR ¶ 36). He violated probation several times in three state cases and a parole violation report in his home invasion case documented 16 separate parole violation. (PSR ¶¶ 30, 31, 35, & 36).

McCollough pleaded guilty to a drug charge with an enhancement for possessing the guns. The Court sentenced him to 70 months in prison.

McCollough began serving his prison sentence on March 2, 2017, and is currently incarcerated at FCI Elkton. He is 45 years old, and his projected release date is March 10, 2022. His only underlying medical conditions are obesity, a history of blood clots, and "essential (primary) hypertension" (not pulmonary hypertension). Nevertheless, McCollough has moved for compassionate release, citing his medical conditions and the Covid-19 pandemic. Even though he extensively argues that exhaustion is not required or would be futile (ECF 32 at 7-20), McCollough exhausted his administrative remedies.

## Argument

I.   **The Bureau of Prisons has responded to Covid-19 by protecting inmates and increasing home confinement.**

   A.   **The Bureau of Prisons' precautions have mitigated the risk from Covid-19 within its facilities.**

The Bureau of Prisons has reacted quickly to confront Covid-19's spread within its facilities. For over almost a decade, the Bureau of Prisons has maintained a detailed protocol for responding to a pandemic. Consistent with that protocol, the Bureau of Prisons began planning for Covid-19 in January 2020.

On March 13, 2020, the Bureau of Prisons began modifying its operations to implement its Covid-19 Action Plan and minimize the risk of Covid-19 transmission into and inside its facilities. *See* BOP Covid-19 Modified Operations Website. Since then, as the worldwide crisis has evolved, the Bureau of Prisons has repeatedly revised its plan. To stop the spread of the disease, the Bureau of Prisons has restricted inmate movement within and between facilities. *See id.* Only limited group gathering is allowed, and social distancing is maximized. Staff and inmates are also issued face masks to wear in public areas. *See* BOP FAQs: Correcting Myths and Misinformation.

Every newly admitted inmate is screened for Covid-19 risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are

provided with medical evaluation and treatment and are isolated from other inmates until testing negative for Covid-19 or being cleared by medical staff under the CDC's criteria. In areas with sustained community transmission, all staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with other symptoms can be placed on leave by a medical officer.

Other access to the facilities has likewise been restricted. Contractors are only permitted access if performing essential services, and any contractor who requires access is screened for symptoms and risk factors. Social and legal visits have been suspended to limit the number of people entering the facility and interacting with inmates. But to ensure that relationships and communication are maintained throughout this disruption, the Bureau of Prisons has increased inmates' telephone allowance to 500 minutes per month. Legal visits are permitted on a case-by-case basis after the attorney has been screened for infection.

Like all other institutions, penal and otherwise, the Bureau of Prisons has not been able to eliminate the risks from Covid-19 completely, despite its best efforts. But the Bureau of Prisons' measures will help federal inmates remain protected from Covid-19 and ensure that they receive any required medical care during these difficult times.

**B.    The Bureau of Prisons is increasing the number of inmates who are granted home confinement.**

The Bureau of Prisons has also responded to Covid-19 by increasing the placement of federal prisoners in home confinement through a procedure that is separate and apart from compassionate release and a reduction in sentence under section 3582(c)(1)(A). New legislation now temporarily permits the Bureau of Prisons to "lengthen the maximum amount of time for which [it] is authorized to place a prisoner in home confinement" during the Covid-19 pandemic. Coronavirus Aid, Relief, and Economic Security Act (CARES Act) § 12003(b)(2), Pub. L. No. 116-136, 134 Stat. 281, 516 (Mar. 27, 2020). The Attorney General has issued two directives, ordering the Bureau of Prisons to use the "various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing Covid-19 pandemic." (03-26-2020 Directive to BOP, at 1; *accord* 04-03-2020 Directive to BOP, at 1). The directives require the Bureau of Prisons to identify the inmates most at risk from Covid-19 and "to consider the totality of circumstances for each individual inmate" in deciding whether home confinement is appropriate. (03-26-2020 Directive to BOP, at 1).

The Bureau of Prisons' efforts on this point are not hypothetical. Approximately 3,183 federal inmates have been granted home confinement since the Covid-19 pandemic began, and that number continues to grow. BOP Coronavirus FAQs. As

the Attorney General's directives have explained, these home-confinement decisions have required evaluating several criteria:

    1.) Each inmate's age and vulnerability to Covid-19;

    2.) Whether home confinement would increase or decrease the inmate's risk of contracting Covid-19; and

    3.) Whether the inmate's release into home confinement would risk public safety.

(03-26-2020 Directive to BOP; 04-03-2020 Directive to BOP).

These criteria not only make sense, but also fit the realities of the Covid-19 pandemic far better than any other solution does. The Bureau of Prisons cannot open its facilities' gates indiscriminately and unleash tens of thousands of convicted criminals, en masse. It must focus on the inmates who have the highest risk factors for Covid-19 and are least likely to engage in new criminal activity. This is true not just to protect the public generally, but to avoid the risk that a released defendant will bring Covid-19 back into the jail or prison system if he violates his terms of release or is caught committing a new crime. *See* 18 U.S.C. § 3624(g)(5); 34 U.S.C. § 60541(g)(2). The Bureau of Prisons' home-confinement initiative thus appropriately focuses on the inmates who will most benefit from release and whose release is least risky.

The Bureau of Prisons must also balance another important consideration: how likely is an inmate to abide by the CDC's social-distancing protocols or other Covid-

19-based restrictions on release? Many inmates—particularly those who have been convicted of serious offenses or have a lengthy criminal record—have already proven unwilling to abide by society's most basic norms. It is more than reasonable to evaluate whether a particular inmate would adhere to release conditions and social-distancing protocols during the pandemic. And if a prisoner would be unlikely to take release conditions or Covid-19 precautions seriously, he would also be far more likely than the general public to contract and spread Covid-19 if released.

Finally, the Bureau of Prisons' home-confinement initiative allows it to marshal and prioritize its limited resources for the inmates and circumstances that are most urgent. For any inmate who is a candidate for home confinement, the Bureau of Prisons must first ensure that his proposed home-confinement location is suitable for release, does not place him at an even greater risk of contracting Covid-19, and does not place members of the public at risk from him. It must assess components of the release plan, including whether the inmate will have access to health care and other resources. It must consider myriad other factors, including the limited availability of transportation right now and the probation department's reduced ability to supervise inmates who have been released. All of those decisions require channeling resources to the inmates who are the best candidates for release.

Those types of system-wide resource-allocation decisions are difficult even in normal circumstances. That is why Congress tasked the Bureau of Prisons to make

them and has not subjected the decisions to judicial review. 18 U.S.C. § 3621(b) ("Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court."); *United States v. Patino*, No. 18- 20451, 2020 WL 1676766, at *6 (E.D. Mich. Apr. 6, 2020) ("[A]s a general rule, the Court lacks authority to direct the operations of the Bureau of Prisons."). It is especially true now, given the Bureau of Prisons' substantial and ongoing efforts to address the Covid-19 pandemic.

Finally and importantly, inmates placed on home confinement by the BOP do not have their sentences reduced or modified. Only the inmate's place of confinement changes. While on home confinement, such inmates remain in the custody of the BOP and can be returned to more restrictive custody under certain circumstances. BOP Program Statement 7320.01, *Home Confinement*. Home confinement transfer decisions, like all place-of-confinement decisions, are within the sole discretion of the BOP and guided by BOP policy.

## II.    The Court should deny McCollough's motion for compassionate release.

McCollough's motion for a reduced sentence should be denied. A district court has "no inherent authority . . . to modify an otherwise valid sentence." *United States v. Washington*, 584 F.3d 693, 700 (6th Cir. 2009). Quite the contrary: a district court's authority to modify a defendant's sentence is "narrowly circumscribed." *United States v. Houston*, 529 F.3d 743, 753 n.2 (6th Cir. 2008). Absent a specific

10

statutory exception, a district court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). Those statutory exceptions are narrow. *United States v. Ross*, 245 F.3d 577, 586 (6th Cir. 2001). Compassionate release under 18 U.S.C. § 3582(c)(1)(A) is equally narrow.

*First*, compassionate release requires exhaustion. If a defendant moves for compassionate release, the district court may not act on the motion unless the defendant files it "after" either completing the administrative process within the Bureau of Prisons or waiting 30 days from when the warden at his facility received his request. 18 U.S.C. § 3582(c)(1)(A); *Raia*, 954 F.3d at 595–96. Because this requirement is a statutory one and not judicially crafted, it is mandatory. *Ross v. Blake*, 136 S. Ct. 1850, 1856–57 (2016); *Island Creek Coal Co. v. Bryan*, 937 F.3d 738, 751 (6th Cir. 2019).

*Second*, even if a defendant exhausts, he must show "extraordinary and compelling reasons" for compassionate release, and release must be "consistent with" the Sentencing Commission's policy statements. 18 U.S.C. § 3582(c)(1)(A). As with the identical language in § 3582(c)(2), compliance with the policy statements incorporated by § 3582(c)(1)(A) is mandatory. *See Dillon v. United States*, 560 U.S. 817 (2010); *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014). To qualify, a defendant must have a medical condition, age-related issue, family circumstance, or other reason that satisfies the criteria in USSG

11

§ 1B1.13(1)(A) & cmt. n.1, and he must "not [be] a danger to the safety of any other person or to the community," USSG § 1B1.13(2).

*Third*, even if a defendant is eligible for compassionate release, the district court may not grant the motion unless the factors in 18 U.S.C. § 3553(a) support release. 18 U.S.C. § 3582(c)(1)(A); USSG § 1B1.13. As at sentencing, those factors require the district court to consider the defendant's history and characteristics, the seriousness of the offense, the need to promote respect for the law and provide just punishment for the offense, general and specific deterrence, and the protection of the public. 18 U.S.C. § 3553(a).

### A.   The Court is barred from granting release because McCollough has not exhausted his administrative remedies.

The Court must dismiss McCollough's motion because, contrary to the notice he filed (ECF 35), he has not satisfied the exhaustion requirement for compassionate release under 18 U.S.C. § 3582(c)(1)(A). Until recently, only the Bureau of Prisons could move for compassionate release. The First Step Act of 2018 amended the statute, permitting defendants to move for it too. First Step Act § 603(b), Pub. L. No. 115-319 (Dec. 21, 2018).

But the provision permitting a defendant-initiated motion includes an exhaustion requirement. *Id.* A district court may not grant a defendant's motion for compassionate release unless the defendant files it "after" the earlier of (1) the defendant "fully exhaust[ing] all administrative rights to appeal a failure of the

Bureau of Prisons to bring a motion on the defendant's behalf," or (2) "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility." 18 U.S.C. § 3582(c)(1)(A); *Raia*, 954 F.3d at 595.

Statutory exhaustion requirements, like the one in § 3582(c)(1)(A), are mandatory. *Ross v. Blake*, 136 S. Ct. 1850, 1856–57 (2016). Section 3582(c)(1)(A) is likely even a *jurisdictional* bar on the Court's authority to consider a motion for compassionate release. *Williams*, 607 F.3d at 1125. The only court of appeals to address this question has agreed. *Raia*, 954 F.3d at 595–97.

The majority of district courts to decide this question nationwide, including many in our district, have similarly held that a "failure to exhaust" under § 3582(c)(1)(A) "cannot be excused, even in light of the Covid-19 pandemic." *United States v. Alam*, No. 15-20351, 2020 WL 1703881, at *2–*3 (E.D. Mich. Apr. 8, 2020); *accord United States v. Austin*, No. 15-20609, 2020 WL 2507622, at *2 (E.D. Mich. May 15, 2020); *United States v. Shah*, No. 16-20457, 2020 WL 1934930, at *2 (E.D. Mich. Apr. 22, 2020); *United States v. Mathews*, No. 14-CR-20427-02, 2020 WL 1873360, at *2–*3 (E.D. Mich. Apr. 15, 2020).

McCollough had not exhausted his administrative remedies when he filed the motion. McCollough requested compassionate release from the warden, which he correctly states was denied on May 7, 2020. But he did not do so until April 29, 2020, when he sent an email to the warden setting forth his reasons for seeking

release. (Ex. A). Thus, the 30-day time period had not lapsed when McCollough filed his motion on May 18. McCollough has therefore not satisfied § 3582(c)(1)(A)'s mandatory exhaustion requirement.

### B.    There are no extraordinary and compelling reasons to grant McCollough compassionate release.

Even if McCollough had exhausted his administrative remedies, compassionate release would be improper. Compassionate release must be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). Congress tasked the Sentencing Commission with "describ[ing] what should be considered extraordinary and compelling reasons for [a] sentence reduction" under § 3582(c)(1)(A), as well developing "the criteria to be applied and a list of specific examples" for when release is permitted. 28 U.S.C. § 994(t).

Because the Sentencing Commission has fulfilled Congress's directive in USSG § 1B1.13, that policy statement is mandatory. Section 3582(c)(1)(A)'s reliance on the Sentencing Commission's policy statements mirrors the language governing sentence reductions under 18 U.S.C. § 3582(c)(2) for retroactive guideline amendments. *Compare* § 3582(c)(1)(A) *with* § 3582(c)(2). When Congress uses the same language in the same statute, it must be interpreted in the same way. *Marshall*, 954 F.3d at 830. In both contexts, then, the Sentencing Commission's restraints "on a district court's sentence-reduction authority [are] absolute." *United States v.*

14

*Jackson*, 751 F.3d 707, 711 (6th Cir. 2014); *accord Dillon v. United States*, 560 U.S. 817, 830 (2010).

The First Step Act did not change that. It amended only *who* could move for compassionate release under § 3582(c)(1)(A). It did not amend the substantive requirements for release. *United States v. Saldana*, No. 19-7057, 2020 WL 1486892, at *2–*3 (10th Cir. Mar. 26, 2020); *United States v. Mollica*, No. 2:14-CR-329, 2020 WL 1914956, at *4 (N.D. Ala. Apr. 20, 2020). Section 1B1.13 remains binding.

Section 1B1.13 cabins compassionate release to a narrow group of non-dangerous defendants who are most in need. That policy statement limits "extraordinary and compelling reasons" to four categories: (1) the inmate's medical condition; (2) the inmate's age; (3) the inmate's family circumstances; and (4) other reasons "[a]s determined by the Director of the Bureau of Prisons," which the Bureau of Prisons has set forth in Program Statement 5050.50. USSG § 1B1.13 cmt. n.1. As the Tenth Circuit recently explained, a district court "lack[s] jurisdiction" to grant compassionate release when a defendant's circumstances do not fall within those categories. *Saldana*, 2020 WL 1486892, at *3.

The Covid-19 pandemic does not, by itself, qualify as the type of inmate-specific condition permitting compassionate release. The Bureau of Prisons has worked diligently to implement precautionary measures reducing the risk from Covid-19 to McCollough and other inmates. Thus, as the Third Circuit has explained, "the mere

existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *Raia*, 954 F.3d at 597.

McCollough's age and medical condition, as confirmed by his medical records, likewise do not satisfy the requirements for release in USSG § 1B1.13 cmt. n.1, even when considered in combination with the Covid-19 pandemic. The CDC has found that people 65 years and older or with the following underlying medical conditions are at risk for severe illness from Covid-19: chronic lung disease or moderate to severe asthma, serious heart conditions, the immunocompromised, severe obesity (defined as BMI of 40 or higher), diabetes, chronic kidney disease, and liver disease. CDC Website, People at Higher Risk.

McCollough is only 45 years old. He states that he suffers from "hypertension, obesity, and a history of blood clots in both legs," as well as a few other conditions including chronic embolism, internal hemorrhoids, and diverticulitis of intestine. (ECF 32 at 2 & 5). While McCollough qualifies as "obese" based on his medical records that show he is 5'6" tall and weighs 234 pounds, his BMI is 37.8, below a BMI of 40. (Ex. B at 1 (filed under seal)). McCollough's medical records show that he has been prescribed medication for blood clots and chronic embolism ("deep venous thrombosis," or "DVT") and has a history of hemorrhoids and diverticulitis,

but those conditions are not among the medical conditions identified by the CDC as placing a person at higher risk and there is no evidence those issues are not under control. (*Id*. at 1-2, 4-6, 8-9, 11, 14, 16-18).

McCollough focuses his argument on his hypertension. (ECF at 5-6). McCollough does have hypertension, however, not all hypertension is the same. His medical records describe his condition as "Essential (primary) hypertension" for which he has been prescribed hydrochlorothiazide. (*Id*. at 2, 4, 6, 9, 14, 16, 18). The CDC, however, specifically lists "pulmonary hypertension" as a risk as a "serious heart condition" that may place individuals at greater risk, but does not include "essential (primary) hypertension." CDC Website, Groups at Higher Risk. Consistent with this distinction, hydrochlorothiazide is a "thiazide diuretic (water pill) that helps prevent your body from absorbing too much salt, which can cause fluid retention" that is "used to treat high blood pressure (hypertension)." Drugs.com (hydrochlorothiazide).

McCollough simply does not have pulmonary hypertension or any reason to believe that his hypertension is more serious than garden-variety high blood pressure, which is what his prescribed medication treats. Indeed, the articles and case McCollough cites about hypertension risks (ECF at 5-6) do not distinguish between these different types of hypertension. McCollough's "hypertension," therefore, does not place him at higher risk, as "at best, the evidence regarding non-pulmonary

17

hypertension is unclear." *Malam, et al v. Alducci*, 20-10829 (E.D. Mich. May 12, 2020), at p. 22.

McCollough is receiving medication to control his high blood pressure and blood clots. So whether considered alone or in combination with the Covid-19 pandemic, McCollough's age and medical condition do not satisfy the initial eligibility criteria for release under USSG § 1B1.13 cmt. n.1. *See United States v. Murphy*, No. 15-20411, 2020 WL 2507619, at *5–*6 (E.D. Mich. May 15, 2020).

Further, although a defendant's heightened risk from Covid-19 in prison might, in some circumstances, satisfy the medical or age criteria in USSG § 1B1.13 cmt. n.1, McCollough's circumstances cast doubt on whether that is true here. The *average* person may have a higher relative risk of contracting Covid-19 in prison than if released among the public at large. But § 1B1.13 requires an *individualized* assessment, and an individual defendant's relative risk varies widely. *See United States v. Austin*, No. 15-20609, 2020 WL 2507622, at *4–*5 (E.D. Mich. May 15, 2020). It depends on the precautions at his prison, the number of Covid-19 cases there, whether and how much that number might increase or decrease, the prison's medical facilities, the defendant's release plan, the threat from Covid-19 in his release location, his access to medical care if released, and his willingness to abide by release restrictions and social-distancing protocols. *See id.* Given McCollough's record, which includes six prior felony convictions, four misconduct citations while

18

in state prison, state parole violations, state probation violations, and 21 additional

minor traffic offense, it is at least questionable whether he would abide by the terms

of home confinement—much less adhere to the CDC's social-distancing protocols

or the Governor's stay-at-home order. (PSR ¶¶ 30, 31, 35, 36, & 42). Because

McCollough would be unlikely to remain in home confinement or take those Covid-

19 restrictions seriously, he would also be far more likely than other members of the

public to expose himself and other people to Covid-19.

Finally, even if the combination of McCollough's medical conditions and the

Covid-19 pandemic satisfied the initial criteria for eligibility in USSG § 1B1.13 cmt.

n.1, McCollough would remain ineligible for compassionate release because he is a

danger to the community – a factor McCollough completely skips over in his motion.

Section 1B1.13(2) only permits release if a "defendant is not a danger to the safety

of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." It

thus prohibits the release of violent offenders, including most drug dealers. *See*

*United States v. Stone*, 608 F.3d 939, 947–48 & n.6 (6th Cir. 2010). It also bars the

release of many other defendants. An evaluation of dangerousness under § 3142(g)

requires a comprehensive view of community safety—"a broader construction than

the mere danger of physical violence." *United States v. Cook*, 880 F.2d 1158, 1161

(10th Cir. 1989) (per curiam). So even many "non-violent" offenders—such as those

who have been involved in serial or significant fraud schemes—may not be released under § 3582(c)(1)(A). USSG § 1B1.13(2); *see Stone*, 608 F.3d at 948 n.7.

Adhering to § 1B1.13(2) is especially important given the current strain on society's first responders and the rise in certain types of crime during the Covid-19 pandemic. Police departments in many cities have been stretched to their limits as officers have either contracted Covid-19 or been placed in quarantine. Some cities, including Detroit, have seen spikes in shootings and murders. Child sex predators have taken advantage of bored school-aged kids spending more time online. Covid-19-based fraud schemes have proliferated. There are real risks to public safety right now, and those risks will only increase if our community is faced with a sudden influx of convicted defendants.

Because McCollough's release would endanger the community, § 1B1.13(2) prohibits reducing his sentence under § 3582(c)(1)(A). McCollough was convicted of being an armed drug trafficker. He was caught with approximately 350 grams of heroin that had been shipped from California, two pistols (one was loaded, one had been reported stolen), additional miscellaneous ammunition, drug packaging materials, and more than $1,100 in cash. The cash combined with McCollough's lack of employment history as documented in the PSR suggests that McCollough made his living in the drug trade. And his criminal history included convictions for

carrying a concealed weapon (twice), cocaine possession (three times), disorderly conduct (twice), and home invasion, among other offenses. (PSR ¶ 31-41).

McCollough is not eligible for compassionate release.

**B.    The factors in 18 U.S.C. § 3553(a) strongly weigh against compassionate release.**

Even when an inmate is statutorily eligible for a sentence modification based on "extraordinary and compelling reasons," compassionate release is not necessarily appropriate. Before ordering relief, the Court must consider the factors set forth in 18 U.S.C. § 3553(a) and determine that release is still appropriate. *See United States v. Austin*, No. 15-20609, 2020 WL 2507622, at *3–*5 (E.D. Mich. May 15, 2020) (holding that the "[d]efendant's circumstances do not warrant compassionate release . . . under 18 U.S.C. § 3553(a)"); *United States v. Murphy*, No. 15-20411, 2020 WL 2507619, at *6 (E.D. Mich. May 15, 2020) (denying compassionate release because "the 18 U.S.C. § 3553(a) sentencing factors do not favor release"); *see also United States v. Kincaid*, 802 F. App'x 187, 188–89 (6th Cir. 2020) (upholding a district court's denial of compassionate release based on the § 3553(a) factors). So even if the Court were to find McCollough eligible for compassionate release, the § 3553(a) factors should still disqualify him.

McCollough's conduct – possessing with intent to distribute heroin – was a dangerous and serious offense that triggered a 5 year mandatory minimum. Heroin is an extremely addictive drug that plagues our community. And he was found with

two firearms and miscellaneous ammunition, and one of the guns was stolen. Guns and drugs are a dangerous combination that increased his guidelines above the mandatory minimum. The drug packaging materials and cash recovered also speak to the seriousness of McCollough's role in drug trafficking. And McCollough had the drugs, guns, and money despite having accrued a lengthy criminal history involving guns, drugs, and home invasion.

McCollough does not even attempt to argue that his offense of conviction does not justify his continued incarceration, instead making the general and obvious observation that the Court did not intend to impose a life sentence. (ECF at 26). He attempts to minimize his prior convictions, calling them "nonviolent." But drug possession and carrying concealed weapons include an inherent risk of violence, and he ignores his home invasion conviction, which involved McCollough breaking into a home, ransacking it, and stealing more than $10,000 in cash, all while on escape status from a correctional center. (PSR ¶ 36).

These facts demonstrate why the Court, in applying the § 3553(a) factors, sentenced McCollough above the mandatory minimum in the first place, and they demonstrate why he should not be released now.

**III.  If the Court were to grant McCollough's motion, it should order a 14-day quarantine before release.**

If the Court were inclined to grant McCollough's motion despite the government's arguments above, the Court should order that he be subjected to a 14-day quarantine before release.

**Conclusion**

McCollough's motion should be denied.

Respectfully submitted,

MATTHEW SCHNEIDER
United States Attorney

s/*Andrew J. Lievense*
Andrew J. Lievense
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226
(313) 226-9665
andrew.lievense@usdoj.gov

DATED:  May 26, 2020

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 26, 2020. I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send notification to all counsel of record.

s/*Andrew J. Lievense*
Andrew J. Lievense
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI 48226
(313) 226-9665
andrew.lievense@usdoj.gov

24